Number 23-3126, Raymond v. Spirit AeroSystems Holdings. Mr. Castor. Thank you, Your Honor. Jim Castor for the appellants. May it please the Court, I'd like to reserve three minutes for rebuttal. The calibration sessions that occurred just before the layoff that is at issue in this case are described by four courageous first-line managers who testified, Volume 7, starting at page 53 of the appellant's appendix. They're brought into a room to do this calibration. HR owns the calibration meeting. They're present. Upper-level management above them are also present. They're not allowed to take any notes with them. No notes, no cell phones, no recordings of what happens in that room will go outside of the room. They meet again and again. They're told before the first meeting by David Walker, who is the chief technology officer, that young people are the future of the company, that Boeing people are old DNA. The only evidence of Mr. Walker's statement is through Deborah Miller, right? That's correct. Who starts at page 70, Your Honor. Ms. Miller testifies that they're told to protect new hires, the fresh young faces in the company, to downgrade the older, sicker employees. And those who refuse, and she testifies about Ellen Oh, who specifically objects to this, she is terminated. She's fired. Those who refuse are suspended, terminated, or forced out. The district court disregarded Mr. Walker's statement that young people are the future of the company. In this an age case... Is there any evidence that Mr. Walker had anything to do with the reduction in force in July? Well, what the evidence demonstrates in the 2018 order that the district court entered, the district court talks about the same upper-level managers orchestrating the plan, which was created in October of 2012. Do I have specific evidence that Mr. Walker was involved? He, what the district court found was that the same upper-level managers executed all of their steps in 11 different steps. Well, but aren't you conflating things? Because in 2012, originally, and I think in October, they were conceiving of a voluntary retirement plan, which is perfectly permissible. It may be permissible, Your Honor. When you're identifying a protected class, like long-tenured employees... Well, you certainly have never argued, I don't think, that 623-D2T-B-II would prevent them from singling out older employees, 62 and over, for a voluntary retirement. We don't contest that. Okay, go ahead. No, Mr. Walker's instruction to the managers is certainly involvement, Your Honor. He instructs the managers who are conducting this reduction in force grading that they are to remember that young people are the future of the company. Now, these meetings happen again and again, according to Ms. Miller's testimony. They have entered into a rigorous calibration where HR and upper management needs to agree on the calibration ratings, and the people who don't go along are pressured out of the company. That is involvement. When he tells them, this is what you need to do when you're doing this grading for the calibration. Remember, young people are the future of the company. Well, isn't it a problem, though, because Deborah Miller, your source for what David Walker said, specifically says that the pressure that she got from HR, she was specifically asked, do you know whether or not these were the people, the higher level authorities within HR or within the company? And she said, no, I really don't know whether or not it was, you know, just the one of the 300 managers that, you know, or one of the HR people that told me what they thought. So Deborah Miller couldn't isolate what she, the pressure that she received to say that this was a widespread pattern of practice. Well, what we do know, she testified about what she knew happened in that room. She testified about meetings happening again and again. It's a reasonable inference that David Walker, as the chief technology officer of the company, when he speaks that young people are the future of the company, is speaking for the company. He is a chief officer of the company. So he speaks for the company.  Pardon me? Isn't that a tautology to say young people are the future? Young people are the future of this court, but they haven't kicked me out. Certainly, Your Honor. I mean, is it true that young people will certainly be sitting in all of our positions at some point in time? Of course. But in an age case, when you're told between measuring X or Y, and you're told specifically by someone speaking for the company that young people are the future of the company, that is an admission. That is direct evidence of age discrimination. And that is then ignored by the court as essentially a truism. Well, they were specifically told not to consider age, weren't they? That was one of many things they were told. They were also told. So I think you're taking issue that the first line managers wanted to keep XYZ people. But when it went up one level, they said, no, we're not going to do it that way. What's wrong with that? If the first line manages buddies with Judge Harris, Hartz, and he wants to keep him on because he's a good guy and he does pretty good stuff, but the next level up says, you know, he's not really up to it, is that age discrimination? It may be if the reason why the other person is saying the next person up is because of age, certainly these are credibility determinations for the jury to make. When an officer of the company who speaks for the company as the company's direct sponsor, someone who makes an admission for the company says young people are the future of the company, that is a direct admission. That is direct evidence in an age case. Now, what I would also say, there are two orders at issue in this case, the 2018 order and the 2023 order. They're here on summary judgment. I'm sorry? They're here on summary judgment, both of them. So the standard of review is de novo with us receiving the benefit of inferences from the record, which goes back to the questions we're talking about now. Our position is the district court weighed the evidence and actually drew inferences in favor of Spirit on significant points like this one that we were just talking about. Well, how does our Apsley case fit into this? Well, that's an interesting, thank you for that question, Your Honor. Apsley is a longer decision, and so I picked out one sentence that I think actually supports our position in this case. Unlike the cases cited by the plaintiffs, I'm reading from Apsley now, there is no evidence that upper-level management viewed older workers as less capable or younger workers more favorably or believed that older workers needed to be replaced by younger ones. That's exactly what we have here. Well, by saying the future is with the young people, that's automatically bad. Is it automatically bad? I mean, you can argue about what that means. You can't say that is what you're telling us. Well, it would be impermissible. It would be relevant evidence, let me say that, for me to say, well, I think that this company would be better served by having all males. Does that indicate, if I'm speaking on behalf of the company, does that indicate automatically there's liability? It's an admission. What if you're saying that in encouraging a voluntary retirement plan to entice people that are older to leave the company? Not a riff. Yeah, not a riff. You know, why is that impermissible? Well, let me just say this. The actual document where this comes from is drafted in October of 2012. It's a series of 11 different cost-down measures, which includes a voluntary retirement program. There's a significant intervening event between October of 2012 and the actual layoff in July of 2013. Because Jeffrey Turner is the CEO in October of 2012, he is opposed to layoffs, flatly opposed. There's no dispute in the evidence about that. Then Mr. Lawson starts on April 6th of 2013, and he is totally in support of layoffs and dogged about the headcount reduction. So it's a reasonable inference that this idea of replacing long-tenured employees with new hires evolves between October of 2012 and July of 2013. That is a very reasonable inference from this evidence, given the fact that Mr. Lawson comes on board and he is dogged on headcount reduction and supports the layoff. What we also have in this case is they're hiring while they're firing. So this isn't really the same as what you think of as a reduction in force. They have 50 salary job offers ready at the time of the layoff in July of 2013. They have almost 500 new jobs, hourly jobs they say, ready by the October job fair. And the evidence in this case is that they hired 1,766 people between 2013 and February of 2015. That's clear evidence in this case. And so this isn't really a reduction in force. It's a replacement in force. Well, how many people retired, took the retirement option? There was actually a retirement option in September of 2013. It wasn't offered until then. We didn't get data about how many people were involved in that and how that implicates the rest of this. I can't answer that question. We didn't get discovery on that issue. Did you try to replace the less valuable employees? That's what the spirit is saying. They wanted to get the 10 most dispensable, the 10% most dispensable employees. What's wrong with replacing them with people they think will be more productive? That's certainly a question of fact for the jury. Did they focus on the bottom 10% or did they force people to downgrade the older employees, which is what Ms. Miller testified was happening? And other managers, Smaltz, Fuller, the other managers testified to the same. I'm going to end my rebuttal time. Well, you haven't addressed the statistical evidence at all. Well, I haven't addressed the statistical evidence, Your Honor, and what specific questions does the court have? The district judge went into some detail in analyzing that evidence, and I don't think your briefing really challenged the reasoning there. It made allegations, but is there . . . you're supposed to . . . the appellant is supposed to show how the judge, how the district court made a mistake. And I didn't see, this is complicated stuff, but I didn't see any attempt really to explain why the district court's analysis of the statistical evidence was wrong. The reasons for rejection of some of the evidence, for the reasons for thinking this evidence isn't very probative and all. Do you have something to say about that? Certainly, Your Honor, it's a battle of the experts. Once the court . . . this is what I would say about the statistical evidence. The evidence demonstrates through Lance Kaufman that people who are older were twice as likely to be terminated as those who were younger. And the judge didn't credit that. Once . . . So you have to explain why the judge was wrong to discredit that, because the analysis didn't include things such as, what's the term, their versatility of the . . . that wasn't even included in the analysis. I would have expected some argument about why, how the district court's treatment of the statistical evidence was wrong. It's not enough to say, oh, there was a contrary expert. Well, Your Honor, there's two basic differences between the experts. And one is about the population that they studied, Dr. White choosing the smaller SPIA population. And the other is about . . . he chose the SPIA population specifically within . . . So Dr. White's analysis . . . what we're saying is those . . . and Dr. White also divides the analysis into 151 pools, basically subscribing to the notion of decentralized decision-making. That . . . You're not responding to my question. The question isn't whether Dr. White's analysis was any good. The question is whether the district court was correct to give very little weight to the . . . to your expert's statements. And he showed various things that he found were flaws. And I would have liked to have heard how the district court heard in its analysis of those things. And I don't see that. It's just . . . you're just . . . the briefs just say, well, we had contrary experts. But the judge, particularly with expert testimony, the judge has a gatekeeping role. And here he didn't go so far as to say this wasn't admissible under Daubert. He left that unsaid, unresolved, but said it's not probative of what they're trying to establish in this case. And . . . The versatility and criticality are, we think, subjective standards. With respect to the performance management rating, they're supposed to go into that. So the court . . . what Dr. Kaufman did is demonstrated that between 2010 and 2013, older workers were twice as likely to be downgraded. Right. And twice as . . . You're not responding, but did you have a question? Well, I just wanted to ask you about that very point. So you're saying that from the 2010 retention exercise versus the 2013 retention exercise had disparate results. Older workers were twice as likely to have a C rating in 2013 versus 2010. But as you've discussed earlier, the elephant in the room is the 2011 and 2012 recalibration of the way that they were evaluating. And, I mean, you find fault in that. But I don't think anybody on either counsel table is going to dispute that the whole criteria, the whole rate-making exercise in 2010 and 2013 are going to be wildly different. So I don't understand why Dr. Kaufman's comparison has anything to do with whether or not the RIF was targeting older people because you're not comparing apples and apples. Well, you're right. Between the critical dates that we're talking about, what Dr. Kaufman demonstrated is that older workers under the same rubric, were more likely to be downgraded than younger workers, which we think is probative. Once the court allows the evidence and doesn't exclude the evidence, I think those kinds of determinations, population choice and pooling, for example, are questions of fact for the jury. Thank you. Thank you. Good morning, Your Honors. I'm Stephen Moore representing Appalese here. And this case is about how the district court reviewed the undisputed material facts and the like, most favorable to the plaintiffs, but ignored unsubstantiated allegations, statements of counsel, speculation and conjecture. Only reasonable inferences were accepted by the district court. The district court here actually drilled down to see there's a statement made in a brief drill down and noticed the record didn't support certain allegations. The statement of counsels are just not evidence on summary judgment. And the Tenth Circuit has said evidence on summary judgment has to be reviewed in the context when summary judgment is being considered. That's the O'Shea versus Yellow Tech case. And as it relates to statistics, the Tenth Circuit in Apsley versus Boeing Company and Spirit Aerosystems says statistics must always be evaluated in the context of all the surrounding facts and circumstances. Now, before I go any further, I want to explain we are dealing with a pattern or practice theory. It's critical. It's different than a single plaintiff theory. That would be under McDonnell-Douglas. Pattern or practice means the standard operating procedure was discrimination. Looking at an isolated or sporadic situation is not enough. The court must look to see, and that's what the district judge did here, was there this continuous pattern or practice of this alleged discrimination? The answer was no. I submit, Your Honors, that's where the rubber meets the road in this case. Now, there are decisions made by hundreds of different first-level spirit managers. The managers exercise discretion while applying facially neutral standards. Well, what about your adversary's argument about what Deborah Miller's testimony was? After all, she did testify that she believed that she was being pressured by HR to downgrade older employees. She then couples that with what David Walker said. David Walker did speak, you know, as the chief technology officer, that the future of the company was newer employees. Viewing the evidence favorably to the plaintiff, why can't we reasonably infer that there was a pattern or practice to downgrade older employees when they were deciding who was going to get a C rating as opposed to an A or B? Your Honor, this is where the district court did drill down on those kind of statements of counsel. That wasn't a statement of counsel. That was a statement in a deposition by Deborah Miller. Okay, let me start with Mr. Walker, and then I'll address Ms. Miller. There's no evidence that Mr. Walker was involved in any decision to conduct a reduction in force. How the reduction- But can we reasonably infer that he had a role to play in the performance rating in 2012? Because the performance ratings in 2012 directly went into the combination of versatility and criticality in deciding who was going to get a C rating in the retention exercise. The criteria for the retention ranking was a three-prong. You had performance, versatility, and criticality, so performance is factually distinct from the other two. But there's no evidence that he was involved in rating or selecting any employees or directing anyone in that regard. And the Doe versus University of Denver case would view this 10-circuit case as an isolated remark. And his statements- It's an isolated remark even if he made that statement in the calibration exercises? Well, the allegation is not that he made it in calibration, but as I understand, performance, which is not the same. But he is not commenting on the reduction in force in the decision- I'm getting confused here. If he had a role in how employees are- how their performance is evaluated, and that was- and there was an ageist bias in that regard, that might well show up eventually in how you determine who's going to be riffed. So if he had a role in evaluating performance and he's telling people how to evaluate performance, would that not be a pattern, a practice, a high-level decision by spirit? There's no evidence in the record that a chief technology officer had any say with the hundreds of people who were involved, many different divisions. What was the nature of this event where he allegedly made these remarks? I thought it was a performance evaluation. As I understand, Deborah Miller testified about this. But the record doesn't really reveal where it occurred or how or to whom. But let me just point out, even if a statement was made, the 10th Circuit line of authority dealing with stray, isolated comments has to be by a decision-maker. There's no evidence that Mr. Walker was deciding anything, reviewing any performance of anyone, as it relates to this case with the reduction in force. And there has to be a causal connection on top of that to the reduction in force here, the selection of older workers. The evidence is just lacking in that area. Well, if there's no testimony about the context in which David Walker made the statement in front of Deborah Miller, and if Deborah Miller didn't testify not only to that statement, but that she was being pressured by HR to downgrade older employees and put them in the C category, how do you say that there's not a reasonable inference to be made that this could have been made in the context of calibration exercises, that the whole point was to train these 300 managers on how to exercise these PM ratings, on who to put in the lower 10%, the C ratings. Doesn't the vacuous nature of the context countenance in favor of denying the summary judgment motion? No, Your Honor. As I said earlier, this is a pattern or practice case. There has to be a showing that all these hundreds of decision-makers all were motivated to discriminate on the basis of age. What if the CEO, what if Mr. Lawson had sat there or Mr. Turner had sat there with the 300 managers and said, I want you to downgrade older employees and, you know, all things being equal, put them in the C rating. And also, you know, keep in mind that the future of the company or the newer employees, not the old men and women. Now would there be evidence to support a pattern of practice, an ageist pattern of practice? Your Honor, there's no evidence that either Mr. Turner or Lawson ever said such a thing. Would you agree that if they did, that would be evidence? If they directed the first-line supervisors to engage in discrimination, yes, but that does not exist in this case. The opposite exists. Let's say you substitute Jeffrey Turner and you put in David Walker, chief technology officer. Why is the result different? Well, like I said, there's no evidence who to whom he was referring to, how many people was he referring to, who had even heard him. Wait, wait, wait. I thought maybe I misunderstood it. I thought this alleged statement by Mr. Miller or not by Mr. Walker was to 300 managers. No, I don't believe that's accurate. It's not in the record. There's no record of when he made or to whom they made that statement. That's correct. Your Honor, I would like to point out the absolute Boeing and Spirit case in the 10th Circuit in 2012 addresses comments that were found to be stray and isolated. And the court basically says a mere handful of statements in the face of hundreds of decisions and performance ratings, retention rankings and layoff selections is just insufficient to establish a pattern or practice. I mean, I'll give you an example. The latest pattern or practice case to come before the United States Supreme Court was Walmart versus Dukes. It was a gender discrimination case. It was a Rule 23 case. But there, the U.S. Supreme Court, in addressing commonality, it did address the pattern or practice paradigm. I thought it was commonality under Rule 23. Yes, I understand that. But the court did address the elements of pattern or practice. I'm just bringing this up as an example. Okay. The U.S. Supreme Court found there was just no evidence that the decision-makers, the front-line supervisors, in that case dealing with pay and promotions, were somehow guided by an edict or something else that required them to always exercise their discretion against women. So taking that by analogy to our case, there is no evidence here whatsoever that the first-line managers were guided by some edict or policy or something else that required them to exercise discretion against older workers. Now, keep in mind, Dr. White, who was the statistician, did a traditional analysis where he measures the expected number of how many people over 40 should have been laid off. And there was a deviation of eight people. And that was found to be statistically insignificant. And by the way, uncontroverted, the other side never did an analysis of that type to refute that number. The average age did not change materially. Well, isn't that in part because the number of people riffed was such a small percentage of the total workforce? So you could have great disparities in who's riffed without changing the average age makeup of the workforce. In looking at the way the reduction force was carried out, even though some of these plaintiffs are crying foul that they were selected for the reduction force, their co-workers who are much older were kept on in many instances. But the age before and after is something the Tenth Circuit has looked at before. For example, in Apsley, it was an important issue. And if they're alleging age discrimination with the intent to get rid of older workers, well, the evidence, at least on the average age front, doesn't support that. Let me just address briefly. There was a comment about new hires after reduction force. Those were for hourly positions. The plaintiffs in this case were salaried employees, not managers, but salaried employees. The positions that they're saying they were hiring for in 2013 were hourly employees, a whole different job category. Were they for the Wichita plant, or was it a company? They included for Wichita, and that's where the job fair was. No, I know it included Wichita. I just didn't know if it included Tulsa. Do you mean the openings? The statistics that you're rebutting. They were just simply for Wichita. For Wichita, okay. Yes, and so this reference to all the companies hiring afterwards, they're hiring for hourly positions that are not part of the positions that were eliminated. And the district judge did say that there was no evidence that anyone was hired for those positions where the employees were laid off. I think that's an important fact. And just real briefly on the statistics, there was no battle of the experts here. The judge accepted as true many of the things the plaintiff's experts said, but they just didn't address what was needed to find a pattern or practice of discrimination. Many of the studies by both experts didn't analyze the correct population. While it may have been mathematically correct, their numbers, it didn't answer or lend any support for a pattern or practice of discrimination. And the district judge, he really did go through the statistical issues and explained his rationale. It is supported by the Apsley case. I see that I've gone over, but the Apsley case found that higher standard deviations were not sufficient for a pattern or practice case because there was no evidence of any sort of pattern or practice with other evidence. We have the same scenario here. Our district judge said two and three standard deviations are not enough, especially when these policies are facially neutral. Workers are being trained to not use age in their decision making. When you say there was no battle of the experts here, I thought the district court discounted a fair amount of plaintiff's experts' testimony as being poor science perhaps because, for example, in performing their analysis, the experts didn't consider the fact that versatility was a factor in hiring. Things like that. You don't read the district court as having done that? No. I mean, the court did say that Dr. Kaufman didn't control for versatility and criticality, and that was factors being measured for retention rank, and he did point that out. But let me give you an example. Like Dr. Bardwell, he says, he's related to the hiring claim, he says if you're a former employee, the chances of you being employed are less than if you were an external hire or an existing employee seeking a promotion. Okay. The judge accepted that as true, but that didn't address an age issue. Okay. The correct analysis would have been to look at the applicant pool, external, internal, people seeking promotions, people formerly laid off or fired for other reasons or resigned. Look at the entire applicant pool and measure the number of people coming in. So Dr. Bardwell didn't study that. It was not helpful because he didn't correlate anything to age. That's my point. Well, I'm not sure we're saying something different. I'm not sure why you're unwilling to say the district court disregarded some of the experts, some plaintiffs' experts. I think what you're saying is, yeah, they performed an analysis, but it was irrelevant to the issue. That's what I'm saying, Your Honor. Thank you. I appreciate the time. Thank you. I ran out of time. I think we're out of time, and I wanted to have a minute or two. A minute. One minute. You had plenty of time, but I'll give you a minute. Thank you. I want to point out that under 216B, there's an initial certification, which under the Thiessen case requires the same policy decision or plan. That's the initial certification standard under 216B. The final certification requires a higher level, a stricter analysis, and a determination by the district court of whether we're talking about one trial or 271 trials. If the individual managers were making this decision, then the case gets decertified. The district court said this, that the assertions by spirit, that these were individual manager decisions without influence by upper management or anyone like David Walker, they said the case should be decertified. The court said this. Those assertions, and that's at page 11 of the 2023 order, are outweighed by evidence that the plaintiffs were subjected to common policies. So the court said this was, and then in the same order. You're taking your minute. All right. My point is this, Your Honor. The court found that there was a common policy. That was necessary and essential to a determination of final certification, and that undermines the notion that individual decision makers, individual managers made these decisions. Thank you. The case is submitted. Counselor, excuse me.